# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE:<br><br>CENTRAL GROCERS, INC., *et al.*,<br><br>    Debtors. | Chapter 7<br><br>Case No. 17-13886<br>(Jointly Administered)<br><br>Hon. Janet S. Baer |
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., *et al.*,[1]<br><br>    Plaintiff,<br><br>v.<br><br>PETE'S FRESH MARKET 4343 CORP., *et al.*,<br><br>    Defendants. | Adversary No. 19-01019 |

---

## TRUSTEE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTS OF THE ORIGINAL COMPLAINT

---

Eric D. Madden
J. Benjamin King
Leo B. Oppenheimer
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, Texas 75201
(214) 420-8900 (T)
(214) 420-8909 (F)

*Special Litigation Counsel to the Chapter 7 Trustee*

Michael M. Eidelman
William W. Thorsness
Allison B. Hudson
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 (T)
(312) 609-5005 (F)

*Counsel to the Chapter 7 Trustee*

---

[1] The Select Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

# TABLE OF CONTENTS

SUMMARY ........................................................................................................... 1

RELEVANT ALLEGATIONS .............................................................................. 2

A.   The Patronage Dividend ............................................................................. 2

B.   The Allowance Dividend ............................................................................. 3

ARGUMENT ........................................................................................................ 4

A.   Defendants' Requested Relief Is Not Permissible on a Motion to Dismiss. ...................... 4

B.   Defendants Cannot Establish on Their Motion to Dismiss That the Trustee's Turnover of
Property Claim is Improper. ............................................................................... 5

C.   CGI Transferred Its Property to Defendants in the Patronage Dividend Transfers. ........... 6

   1.   Defendants Cannot Establish on Their Motion to Dismiss That CGI's
   Patronage Dividends Were Patron and Member Property. ..................................... 7

   2.   Defendants Cannot Establish on Their Motion to Dismiss That CGI's
   2016 Patronage Dividend Was a Proper Patronage Dividend. ................................. 9

D.   740 ILCS 160/5(a)(2) Does not Require a "Voluntary" Transfer, But Even if it Did, the
Patronage Dividend Transfers Were Voluntary. ....................................................... 10

E.   The Trustee Sufficiently Alleges That the Defendants Were Non-statutory Insiders. ....... 15

F.   The Complaint Properly Seeks to Avoid Obligations. ................................................ 18

G.   The Complaint states a cause of action for unjust enrichment. ................................... 20

CONCLUSION .................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ...................................................... 4

*Begier v. I.R.S.*,
    496 U.S. 53, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990) ...................................................... 8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................... 20

*Chatz v. World Wide Wagering, Inc.*,
    413 F. Supp. 3d 742 (N.D. Ill. 2019) .............................................................................. 4, 5

*Chicago Title Ins. Co. v. Bass*,
    21, N.E. 3d 444, 2015 IL App (1st) ...................................................................................... 21

*Cordes & Co., LLC v. Mitchell Companies, LLC*,
    605 F. Supp. 2d 1015 N.D. Ill. 2009) .................................................................................. 10

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ................................................................................................................. 20

*In re Appleseed's Intermediate Holdings, LLC*,
    470 B.R. 289 (D. Del. 2012) .................................................................................................. 7

*In re Canopy Financial, Inc.*,
    477 B.R. 696 (N.D. Ill. 2012) ....................................................................................... 10, 11

*In re Cent. Illinois Energy Coop.*,
    526 B.R. 786 (Bankr. C.D. Ill. 2015) .................................................................................. 19

*In re Donlevy*,
    342 B.R. 774 (Bankr. N.D. Ill. 2006) .................................................................................... 9

*In re Evergreen Energy*,
    546 B. R. 549, (Bankr. D. Del. 2016) .................................................................................. 16

*In re Fortune Natural Resources Corp.*,
    350 B.R. 693 (Bankr. E.D. La. 2006) .................................................................................. 17

*In re Glob. Aviation Holdings Inc.*,
    478 B.R. 142 (Bankr. E.D.N.Y 2012) ............................................................... 16

*In re Gluth Bros. Const., Inc.*,
    424 B.R. 379 (Bankr. N.D. Ill. 2009) ............................................................... 18

*In re Longview Aluminum, L.L.C.*,
    657 F.3d 507 (7th Cir. 2011) .................................................................... 15, 16

*In re McHugh*, No. 02 A 00254,
    2003 WL 21018601 (Bankr. N.D. Ill. May 1, 2003) ...................................... 16

*In re S. Beach Sec., Inc.*,
    376 B.R. 881 (Bankr. N.D. Ill. 2007) ............................................................... 18

*In re Trace Int'l Holdings, Inc.*,
    289 B.R. 548 (Bankr. S.D.N.Y. 2003) ................................................................. 7

*In re TSIC, Inc.*,
    428 B.R. 103 (Bankr. D. Del. 2010) ................................................................. 19

*In re Veluchamy*,
    879 F3d 808 (7th Cir. 2018) ............................................................................... 5

*In re Yonikus*,
    996 F.2d 866 (7th Cir. 1993) ............................................................................... 6

*Krehl*,
    86 F.3d at 741(1978 U.S.C.C.A.N. 5787) ...................................................... 15

*Leonard Cessna v. Rea Energy Coop., Inc.*,  No. 3:16-42,
    2016 WL 3963217 (W.D. Pa. July 21, 2016) ................................................... 7

*United Cooperatives, Inc. v. C.I.R.*,
    4 T.C. 93 (T.C. 1944) ........................................................................... 13, 14, 15

*United States Sec. & Exch. Comm'n v. River N. Equity LLC*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ................................................................. 3

*Zidek v. Analgesic Healthcare, Inc.*, Case No. 13 C 7742,
    2014 WL 2566527(N.D. Ill. June 6, 2014) ....................................................... 4

**Statutes**

11 U.S.C. § 541 ...................................................................................................... 7, 8

11 U.S.C. § 541(a)(1) ............................................................................................ 6, 7

11 U.S.C. § 542(b) ................................................................................................... 4

11 U.S.C. § 548(a)(1)(B) ........................................................................................ 19

11 U.S.C. 101(31) ................................................................................................... 15

11 U.S.C. 548(a)(1) ................................................................................................ 10

26 U.S.C. § 1388(a)(2) ........................................................................................... 15

**Other Authorities**

*Black's Law Dictionary* (10ᵗʰ ed. 2014) ................................................................. 18

**Rules**

Fed R. Bankr. P. 7008 ............................................................................................ 20

Fed R. Bankr. P. 7012 ............................................................................................ 20

Howard B. Samuels ("Trustee"), not individually, but as chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC (together, the "Select Debtors"), opposes Defendants' Partial Motion to Dismiss ("Motion)" [Doc. 33]. The Trustee requests that to the extent the Court grants any portion of the Motion, the Court allows him leave to amend the Original Complaint ("Complaint," or "Compl.").

## SUMMARY

1.    The Trustee seeks to recover $453,000 in transfers that debtor Central Grocers, Inc. ("CGI") made to the Defendants in the months preceding its bankruptcy. The Trustee also seeks to recover a $1,650,000 trade debt that Defendants refuse to pay. That the Trustee must bring legal claims to recover these amounts is particularly egregious because the Defendants are owned and/or operated by one of CGI's former directors and fiduciaries—James Dremonas. Rather than protect CGI and its creditors, Director Dremonas made sure to take every dime he could from CGI as the company failed.

2.    Defendants primarily attack the fraudulent transfer and preference counts brought to recover the transfers. Their principal argument is that CGI held the cash it transferred to them in trust for their benefit. To get there, they completely ignore the allegations in the Complaint and instead rely on documents outside the Complaint and off-point cases interpreting the federal tax code. Nothing they point to demonstrates even one of the many requirements necessary for a trust to exist. They also claim that the preference counts must be dismissed because the Complaint does not allege that they are insiders. To the contrary, allegations that Director Dremonas used his power over an insolvent CGI to secure preferential treatment for his privately-owned companies are exactly the type of allegations that justify "non-statutory" insider status.

1

3.      For these reasons, and as further discussed herein, the Court should deny the Motion.[1]

## RELEVANT ALLEGATIONS

4.      James Dremonas is a former director of debtor CGI.[2]  During his tenure, an insolvent CGI transferred over $450,000 to his privately-owned companies—the Defendants.[3]  The allegations related to these transfers are summarized below.

**A.      The Patronage Dividend**

5.      CGI was a non-profit wholesale grocery cooperative.  It bought groceries from vendors and sold them at wholesale prices to its customers, which were retail grocery stores.[4]  At the end of each fiscal year, CGI's board of directors determined how much of CGI's "profit" from its wholesale operations to distribute to its customers as a "patronage dividend" (sometimes referred to as a "patronage rebate").[5]  CGI's By-laws required the board of directors to make this determination.[6]

6.      In September 2016, the board—including Director Dremonas—unanimously authorized a patronage dividend (the "2016 Patronage Dividend").[7]  On October 27, 2016, CGI paid the Defendants $426,138.18 as their share of the 2016 Patronage Dividend (the "Patronage

---

[1] The Trustee consents to the dismissal of Count 19.

[2] Compl. ¶ 19.

[3] *Id.* ¶¶ 35-36.

[4] *Id.* ¶ 20.

[5] *Id.* ¶ 24.

[6] Compl. Ex. B. at 25.

[7] Compl. ¶ 26.

Dividend Transfers").[8]   The cash used to make the Patronage Dividend Transfers was under CGI's unrestricted control and resided in its single, comingled "master" bank account.[9]

7.      In counts 3 and 5, the Complaint seeks to avoid any obligation CGI undertook to pay Defendants the 2016 Patronage Dividend.  In counts 4, 6, and 8, the Complaint seeks to avoid the payment of the Patronage Dividend Transfers themselves as fraudulent transfers.  As an alternative to the fraudulent transfer counts, in counts 7 and 9, the Complaint seeks to avoid the Patronage Dividend Transfers as preferences based on the alternative allegation that CGI had an obligation to pay patronage dividends.

**B.      The Allowance Dividend**

8.      CGI entered into purchase agreements with vendors whereby it earned savings or rebates on its purchases, known as "allowances."[10]   These "allowance dividends" where then paid out each year at the same time as the patronage dividend.[11]   The payments on account of the 2016 Patronage Dividend and the 2016 Allowance Dividend were lumped together and paid as a single check.   On October 27, 2016, CGI paid the Defendants $185,211.06 as their share of the 2016 Allowance Dividend (the "Allowance Dividend Transfers").[12]   The cash used to pay make the Allowance Dividend Transfers was under CGI's unrestricted control and resided in its single, comingled "master" bank account.

---

[8] *Id.* ¶ 35.

[9] *United States Sec. & Exch. Comm'n v. River N. Equity LLC*, 415 F. Supp. 3d 853, 857 (N.D. Ill. 2019) ("[T]he Seventh Circuit allows a plaintiff to supplement allegations in responding to a Rule 12(b)(6) motion, provided the supplemental allegations are consistent with the complaint.").

[10] Compl. ¶ 29.

[11] *Id.* ¶ 30.

[12] *Id.* ¶ 36.

9.      Soon after receiving these transfers from CGI, the Defendants refused to pay their $1,650,000 trade debt (the "Unpaid Receivable").[13]  A few weeks later, CGI's creditors forced it into bankruptcy.[14]

## ARGUMENT

**A.      Defendants' Requested Relief Is Not Permissible on a Motion to Dismiss.**

10.      The Motion seeks dismissal of *counts*, not *claims*.  This is impermissible.

11.      To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state *a* claim to relief that is plausible on its face."[15] "A Rule 12(b)(6) motion should therefore be granted only when the facts in the complaint, taken as true, do not state a plausible claim under *any* recognized legal theory."[16]

12.      "The federal rules allow for dismissal for 'failure to state a claim' but do not provide a basis for striking individual legal theories."[17]  "[I]f there is any identifiable legal theory that supports a given claim, that claim survives, and the Court has no need—or authority—to 'dismiss' alternative legal theories presented in support of that claim at this stage of the litigation."[18]

13.      The Complaint brings two counts to recover the Unpaid Receivable: Count 1, which seeks to recover for "Turnover of Property" pursuant to 11 U.S.C. § 542(b), and Count 2, which

---

[13] *Id.* ¶ 32.

[14] *Id.* ¶ 41.

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[16] *Chatz v. World Wide Wagering, Inc.*, 413 F. Supp. 3d 742, 749 (N.D. Ill. 2019) (original emphasis) (citing *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013) and *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012)).

[17] *Zidek v. Analgesic Healthcare, Inc.*, Case No. 13 C 7742, 2014 WL 2566527, at *2 (N.D. Ill. June 6, 2014) (Leinenweber, J.).

[18] *Chatz*, 413 F. Supp. 3d at 749.

seeks to recover for breach of contract.  Both Counts describe different legal bases to recover the same Unpaid Receivable.  Defendants only seek to dismiss Count 1.

14.     Defendants do not ask for dismissal of Counts 8 or 15, which seek to avoid the Patronage Dividend Transfers and the Allowance Dividend Transfers (together, the "Transfers"), respectively, pursuant to 740 ILCS 160/6(a).  Defendants also do not ask for dismissal of Counts 11 and 13, which seek to avoid the Allowance Dividend Transfers under 11 U.S.C. § 548 and 740 ILCS 160/5(a)(2).  Even if the Court were to grant the Motion in full, the Trustee would still have legal bases to recover the exact same Transfers as he has now.

15.     What Defendants want is for the Court to use Rule 12(b)(6) to eliminate alternatively pleaded theories of recovery, but as Judge Tharp recently explained in *Chatz v. World Wide Wagering, Inc.*, this is not permissible.[19]  For this reason, the Court should deny the Motion in its entirety.

**B.      Defendants Cannot Establish on Their Motion to Dismiss That the Trustee's Turnover of Property Claim is Improper.**

16.     Defendants argue that the Court should dismiss the Trustee's count for Turnover of Property because there is a dispute as to whether the Unpaid Receivable is due and owing.[20]  But neither the Complaint nor any documents properly considered on a motion to dismiss establish that the Unpaid Receivable is actually disputed.  Defendants cannot render Count 1 subject to dismissal based on their own representation in their Motion.   Moreover, the Defendants refusal to pay for groceries they bought does not make the Unpaid Receivable disputed.[21]

---

[19] *Id.*

[20] Motion ¶¶ 10-13.

[21] *See In re Veluchamy*, 879 F3d 808, 815-17 (7th Cir. 2018) (holding that turnover was the appropriate remedy to recover the debtor's property, even though the defendant disputed whether the property at issue was the debtor's).

C.     **CGI Transferred Its Property to Defendants in the Patronage Dividend Transfers.**

17.     Defendants argue that the Court should dismiss several (but not all) of the counts arising out of the Patronage Dividend Transfers because the money CGI transferred was not its property.  Defendants' argument is wrong.  The funds CGI transferred were its property at the time of the transfers.  At the least, Defendants cannot establish on a motion to dismiss that the funds were their property.

18.     The bankruptcy estate consists of all of the debtor's legal and equitable interest in property as of the date the bankruptcy petition is filed.[22]  The Seventh Circuit has adopted a broad view of the scope of property of the estate, noting that "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of § 541."[23]

19.     Here, the Complaint alleges that CGI made the Patronage Dividend Transfers.[24] The Complaint further alleges that these funds were accrued from CGI's operation of its wholesale business.[25]  The Complaint also alleges that CGI exercised control over its funds in that CGI could determine how much to retain for "costs, debt service, and any other reason deemed to be in the best interests of CGI" before paying out any excess to CGI's Members and patrons.[26]  Thus the Complaint plausibly alleges that the Patronage Dividend Transfers constituted transfers of CGI's property.  On the other hand, the Complaint ***does not*** allege that the Patronage Dividend Transfers were made with Defendants' money, that the money CGI used to pay the Patronage Dividend Transfers was generated using Defendants' money, that CGI held the money transferred in trust

---

[22] 11 U.S.C. § 541(a)(1).

[23] *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993).

[24] Compl. ¶ 35.

[25] *Id.* ¶ 24.

[26] *Id.* ¶¶ 24, 36.

for the Defendants, or that the money came from any segregated account maintained for Defendants specifically or for members and patrons generally.

20.      Indeed, Defendants do not contest that the Complaint plausibly alleges that the Patronage Dividend Transfers constituted transfers of CGI's property.  Instead, they argue that the Court should consider information outside the Complaint to conclude that the funds CGI used to make the Patronage Dividend Transfers were not, as a matter of law, CGI's property.  They argue that, under federal tax law, patronage dividends are not property of the paying cooperative, and the Patronage Dividend Transfers constituted a patronage dividend under federal tax law.[27]

21.      There are numerous problems with this argument.

**1.      Defendants Cannot Establish on Their Motion to Dismiss That CGI's Patronage Dividends Were Patron and Member Property.**

22.      As legal background, normal corporate dividends are debtor property and are proper subjects of avoidance claims.[28]  Defendants' argument depends on establishing that a for-profit corporation's profits are different from a non-profit cooperative's, for purposes of 11 U.S.C. § 541(a)(1).  Defendants have failed to do so.

23.      **First**, Defendants seek to apply federal tax law cases outside of their limited, intended context.  Those cases describe some theories supporting the exclusion of a cooperative's profits from federal taxation in situations where the federal government and taxpayers disputed whether cooperative income should be taxed.[29]  Those cases do not mean—at least for purposes of

---

[27] Motion ¶¶ 14-25.

[28] *In re Trace Int'l Holdings, Inc.*, 289 B.R. 548, 557 (Bankr. S.D.N.Y. 2003) (debtor's dividend payment "undeniably" constituted a transfer of debtor's property); *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 299 (D. Del. 2012) (denying motion to dismiss fraudulent transfer claim to avoid dividend payment and holding debtor had property interest in the dividend, even though debtor was under a contractual obligation to pay the dividend).

[29] *See* Motion ¶¶ 21-23.  Defendants cite only one non-tax case: *Leonard Cessna v. Rea Energy Coop., Inc.*, No. 3:16-42, 2016 WL 3963217 (W.D. Pa. July 21, 2016).  But the portion of that case Defendants cite was the court's summary

11 U.S.C. § 541—that the money collected in a cooperative's operating account from its normal operations magically becomes its patrons' property to the extent the cooperative's income exceeds its expenses. None of the cases Defendants cite hold that a cooperative's profits are property of the patrons for any purpose other than taxation. On the other hand, the broad reach of § 541 encompasses money generated by a cooperative's normal operations and kept in the cooperative's general bank account over which the cooperative had complete control.

24.    Based on the off-point cases that they cite, Defendants ask the Court to find that CGI held the funds it transferred to them in trust. But they point to nothing that created this trust. They can point to no provision of the Internal Revenue Code that creates a trust. The statutory provisions regarding cooperative taxation say nothing about cooperatives holding profits in trust for patrons.[30] Congress knows how to create a statutory trust. In *Begier v. I.R.S.*, for example, the U.S. Supreme Court found that a trust was created where the statute stated that the funds at issue "shall be held to be a special fund in trust for the United States."[31] But Congress did not do that with respect to cooperatives' profits.

25.    ***Second,*** Defendants suggest that CGI's Articles of Incorporation establish that CGI was a trustee or mere conduit for the patronage rebates. But the Articles of Incorporation do not say that. Defendants quote from paragraph (d) from Article III of the Articles of Incorporation, but they omit key language (underlined below) to strengthen their argument:

> [CGI is organized] … to act as agent, <u>representative or owner</u> with reference to food and grocery products, etc., in the efficient and economical producing, assembling, grading, handling, shipping, marketing, buying and selling of the same, and to do anything that

---

of the plaintiff's allegations. *See id.* at *1; Motion 15. The court did not "hold" what the Defendants claim in the Motion.

[30] *See* 26 U.S.C. § Subt. A, Ch. 1, Subch. T, *et seq.*

[31] 496 U.S. 53, 60, 110 S. Ct. 2258, 2263, 110 L. Ed. 2d 46 (1990) (citing 26 U.S.C. § 7501).

will reduce the cost of salable merchandise to the member retail grocers[.]

But even if CGI were only authorized to act as an agent (as opposed to also as an "owner"), that does not mean that all of CGI's profits (if it had any) were actually property of its patrons.

26.    Certainly, the language in the Articles of Incorporation is a long way from the specific language required under Illinois law to create an express trust:

> Under Illinois law, the requirements of a valid express trust are: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by the circumstances which show that the settlor intended to create a trust; (2) a definite subject matter of trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee.[32]

Defendants have not pointed to any language in any document—and certainly not the Complaint—coming close to establishing an express trust.

**2.    Defendants Cannot Establish on Their Motion to Dismiss That CGI's 2016 Patronage Dividend Was a Proper Patronage Dividend.**

27.    Defendants' property argument also fails because they cannot establish at the motion to dismiss stage that the Patronage Dividend Transfers was a proper patronage dividend under federal tax law.  Even if Defendants were right that a cooperative's profits appropriately distributed as a cooperative patronage dividend are property of the transferee (they are not), there is no basis for the proposition that money **inappropriately** distributed as an **improper** cooperative dividend is property of the transferee.  The Complaint here does not allege that CGI's declaration of and payment of a patronage dividend for fiscal 2016 was appropriate.  To the contrary, the Complaint alleges that CGI was insolvent at the time CGI declared the 2016 Patronage Dividend

---

[32] *In re Donlevy*, 342 B.R. 774, 781 (Bankr. N.D. Ill. 2006).

and made the Patronage Dividend Transfers.[33]  Thus, the patronage dividend was improper and the funds used to make it were not from CGI's profit—even if it were true that funds properly paid as a patronage dividend would not have been CGI property.

28.     In addition, Defendants' "property" arguments do not apply at all to Counts 3 and 5, which seek to avoid *obligations*, not transfers.  The statute is clear that the "interest in property" requirement applies to transfers, not obligations: "The Trustee may avoid any transfer…of an interest of the debtor in property, **or** any obligation…."[34]  Thus, Counts 3 and 5 survive regardless of whether CGI had a property interest in the cash paid out as the patronage dividend.

**D.     740 ILCS 160/5(a)(2) Does not Require a "Voluntary" Transfer, But Even if it Did, the Patronage Dividend Transfers Were Voluntary.**

29.     Defendants next claim that Counts 5 and 6 must be dismissed because the Patronage Dividend Transfers were not "voluntary payments."[35]  Counts 5 and 6 are both brought pursuant to 740 ILCS 160/5(a)(2).  Defendants argue that the By-Laws establish that the Patronage Dividend Transfers were not "voluntary," which, they claim, is a necessary element to state a claim under section 5(a)(2).

30.     This argument fails right out of the gate because a "voluntary payment" is not an element of a claim under section 5(a)(2).[36]  The case that the Defendants cite for the "voluntary payment" element—*Cordes & Co., LLC v. Mitchell Companies, LLC*, 605 F. Supp. 2d 1015 N.D. Ill. 2009)—did not involve a dispute about the voluntariness of the payment, and the case is dicta

---

[33] Compl. ¶¶ 26-28, 38-41.

[34] 11 U.S.C. 548(a)(1) (emphasis added).

[35] Motion ¶ 26.

[36] *In re Canopy Financial, Inc.*, 477 B.R. 696, 707–08 (N.D. Ill. 2012) ("In light of the clear language of the UFTA and the Illinois Supreme Court's determination that under the older Illinois statute no voluntary transfer was required, the Court determines that the Illinois Supreme Court would not interpret the UFTA to require a voluntary transfer.").

on whether payment must be voluntary.  As the court in *In re Canopy Financial* explained in a thorough discussion, the "voluntary payment" element is a holdover from incorrect readings of a prior version of section 5(a)(2).[37]

31.     But even if "voluntary payment" were an element, CGI's By-Law do not establish that its board of directors had no discretion over the fact or amount of the 2016 Patronage Dividend. To establish that CGI's board lacked discretion (despite the allegations in the Complaint to the contrary[38]), the Defendants raise a two-step argument.  First, they argue that the By-laws required that the patronage rebates "qualify as 'patronage dividends' within the meaning of Section 1388(a) of the Internal Revenue Code of 1986, as amended."[39]  Second, for the distribution to qualify as a patronage dividend for tax purposes, the board could have no discretion with respect to the fact or amount of the rebate/dividend.[40]  Because the By-laws mandated that the patronage rebates receive the favorable tax treatment, and because favorable tax treatment required the Directors to not have discretion, *ergo* the Directors must not have had discretion.[41]

32.     The Defendants' argument fails at both steps.  **First**, the By-laws did **not** "**require**" the rebate to qualify for "patronage dividend" treatment for tax purposes.[42]  Rather, the By-laws say that "it is intended" that the rebates qualify for this tax treatment.[43]  The whole premise of the Defendants' argument is that the By-laws "required" CGI to pay a rebate that qualified as a "patronage dividend" for purposes of federal taxation, but the By-laws do not require that.  The

---

[37] *Id.* at 707-08.

[38] Compl. ¶¶ 24, 26.

[39] Motion at p. 13.

[40] *Id.* at pp. 14-16.

[41] *Id.*

[42] *See id.* at p. 13.

[43] *See* Compl. Ex. B at 25.

11

Defendants just added the "required" in their description of the By-laws to invent a requirement that does not exist.

33.     Far from precluding the board from exercising any discretion over the rebate, the By-laws make clear that the board *does* have discretion over the amount of the rebate.  The By-laws state:

> The Board of Directors may set aside reasonable reserves from time to time by resolution as it deems appropriate to provide for any contingencies or expected losses of the Corporation and as it otherwise deems to be in the best interests of the Corporation.[44]

The By-laws further explain the calculation for the amount of the rebate:

> The Corporation shall distribute to qualifying Members and Patrons as Patronage Rebates all of the Corporation's Rebatable Net Income[45] in excess of such reserves, payment of debts, capital improvements or additions, and working capital requirements as the Board of Directors may from time to time determine.[46]

The first quote makes clear that CGI could "set aside reasonable reserves" as its board of directors deemed appropriate "for any contingencies or expected losses," or as they "otherwise deem[ed] to be in the best interests of the Corporation."  The second quote demonstrates that the amount to be rebated was subject to the "reserves, payment of debts, capital improvements or additions, and working capital requirements" as the Directors might "from time to time determine."

34.     Further evidence that CGI had discretion over the amount of the 2016 Rebate comes from the fact that its board *did* exercise discretion over the rebate.  At the October 1, 2016, Board

---

[44] *Id.*; Compl. ¶ 24.

[45] "Rebateable Net Income" means the Corporation's gross income from operations remaining after deducting all expenses (other than provision for federal income taxes), computed in accordance with the customs and practices of the Corporation and generally accepted accounting principles.  Compl. Ex. B at 3.

[46] *Id.* at 25; Compl. ¶ 24.

meeting, the board voted to withhold 30% of the 2016 Rebate to satisfy CGI's lenders.[47]

Moreover, the board voted on the amount of the 2016 Rebate.[48]  If CGI had no discretion as to the

amount of the 2016 Rebate, there would be no purpose in voting.

35.    So, it is just not true that the By-laws did not allow for CGI to exercise discretion

over how its cash was to be deployed.  At the least, Defendants cannot establish on a motion to

dismiss that the board lacked discretion.  The board chose to cause CGI to distribute all of its

money to its customers (including the Defendants), but the board had discretion under the By-laws

to use the money instead for other purposes.

36.    **Second,** Defendants are wrong on the tax implications of the board's discretion.

That CGI's board had the discretion to allot some portion of the company's otherwise rebatable

income to reserves (or to "payment of debts, capital improvements or additions, and working

capital") did not render the amounts actually rebated subject to taxation.  To qualify as a tax-

exempt "patronage dividend," the dividend must be paid pursuant to "an obligation of [the

cooperative] to pay such amount, which obligation existed before the organization received the

amount so paid."[49]  But this does not mean a cooperative cannot set aside some money from its

income to guard against future contingencies without rendering the distributed portion of its

income subject to income tax.  Such a strict requirement would deter a cooperative from

responsibly preparing for contingencies.

37.    In fact, one of the cases the Defendants rely on—the U.S. Tax Court's decision in

*United Cooperatives, Inc. v. C.I.R.*, 4 T.C. 93 (T.C. 1944)—makes this very point.  There, an

agricultural cooperative gave itself discretion to use its income in two respects other than

---

[47] Compl. ¶¶ 27-28.

[48] Compl. ¶ 26.

[49] 26 U.S.C. § 1388(a)(2).

distributing it as a rebate to members.  It could reserve an unlimited portion (but at least 5%)

against the depreciation of its property (presumably so it would have funds to buy new equipment

at the end of the old equipment's useful life), ***and*** it could distribute a portion of its income as

dividends to common stockholders.[50]  The Tax Court explained that the depreciation reserve was

permissible but the potential for distributing income to common stockholders rendered the

cooperative's income taxable to the extent the cooperative had discretion to distribute it as a

dividend to stockholders

> **The right of the petitioner corporation to allocate a part of its receipts to a reserve for depreciation need not concern us. The establishment and maintenance of a depreciation reserve and periodic additions thereto in reasonable amounts constitute a proper operational expense**, and the net income of petitioner available under its bylaws for distribution to its patrons would have been calculated by subtracting from gross income the amounts reserved for depreciation even without the express provisions of article VI of the bylaws.

> **However, the right of petitioner's board of directors to declare dividends upon its common stock is radically different**. These dividends, if paid, would be paid out of net income. If dividends were not paid, then the net income of petitioner available for distribution to its patrons would be accordingly greater. The choice of whether so much of its net income as equaled 8 percent of the par value of its common stock should be distributed to its stockholders as a dividend or to its patrons as rebates was in the corporation. Therefore, it cannot be said that all of the money eventually distributed to its patrons as so-called patronage dividends was received by petitioner with a legal obligation existing at the time of its receipt to later so distribute it.

> We conclude that petitioner's patrons were entitled by reason of its bylaws to that part of the so-called patronage dividends distributed to them which was in excess of 8 percent of the par value of petitioner's common stock outstanding and to that extent these patronage dividends were properly excluded from the taxable income of petitioner. However, that part of these patronage dividends which could have been distributed in the discretion of petitioner's board of directors as dividends upon petitioner's common stock must be considered as the property of petitioner and taxable to it as its income.[51]

---

[50] *United Cooperatives*, 4 T.C. at 108.

[51] *Id.* (emphasis added).

38.     Here, the By-laws gave the board discretion to set aside a portion of CGI's otherwise rebatable income to protect CGI against future contingencies, and consistent with the *United Cooperatives* decision, giving the board that discretion did not preclude CGI's rebate from qualifying as a "patronage dividend" within the meaning of 26 U.S.C. § 1388(a)(2).

39.     In sum, there is no requirement under 740 ILCS 160/5(a)(2) that the transfer at issue be voluntary.   But regardless, CGI's decision to authorize and pay the Patronage Dividend Transfers was voluntary.

**E.     The Trustee Sufficiently Alleges That the Defendants Were Non-statutory Insiders.**

40.     Defendants argue that the Trustee's federal and Illinois preference claims (Counts 7, 9, 14, and 16) must be dismissed because the Complaint does not sufficiently allege that they were "insiders" of CGI.  The Bankruptcy Code provides a list of "statutory" insider relationships.[52] Defendants are not themselves statutory insiders, but James Dremonas—the man who owns Defendants—is a statutory insider by virtue of this status as a director.  Defendants and Director Dremonas hope to escape liability because Director Dremonas engineered payments to companies he owned, instead of to himself.

41.     The Bankruptcy Code's list of insiders is non-exclusive and is merely "illustrative of types of insider relationships."[53]  A "non-statutory" insider relationship is a relationship to the debtor that is not listed in the Code but is nonetheless "sufficiently close" with the debtor that the payments are subject to closer scrutiny.[54]  To plead a non-statutory insider relationship in the

---

[52] 11 U.S.C. 101(31).

[53] *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 509 (7th Cir. 2011); *Matter of Krehl*, 86 F.3d 737, 741 (7th Cir. 1996) (the statutory list "is intended to be illustrative rather than exhaustive.").

[54] *Krehl*, 86 F.3d at 741–42 (quoting S. Rep. No. 989, 95th Cong.2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 5810).

Seventh Circuit, a plaintiff must allege that (1) the defendant's relationship to the debtor is beyond a mere creditor-debtor relationship, and (2) that the transaction was not conducted at arm's length.[55]  Both of these elements are satisfied here.

42.    ***First***, Defendants' relationship to CGI is beyond a mere creditor-debtor relationship.  Director Dremonas was both the owner of the Defendants and a director of the debtor at the time of the Transfers.[56]  Furthermore, Director Dremonas, as a board member, used his power to authorize the Transfers to the Defendants while CGI was insolvent.[57]  Multiple courts have found that such allegations of overlapping control used to secure preferential treatment are enough to satisfy the closeness of relationship criteria.

43.    For example, in *In re Evergreen Energy*, the trustee alleged that a debtor's board approved professional services agreements with companies controlled by one of its directors.[58] The debtor, while insolvent, then paid the companies over $1.3 million under the agreements.[59] The trustee sought to avoid the payments as preferential payments to insiders.  The defendants argued that the trustee failed to allege that they had an insider relationship to the debtor.  The court rejected this argument and held that allegations of a debtor's director using his power to secure

---

[55] *Longview Aluminum*, 657 F.3d at 509; *In re McHugh*, No. 02 A 00254, 2003 WL 21018601, at *10 (Bankr. N.D. Ill. May 1, 2003) (applying Seventh Circuit's non-statutory insider analysis to state law analog preference claim).

Defendants cite to a case from the Eastern District of New York, *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142 (Bankr. E.D.N.Y 2012), for the proposition that a non-statutory insider must have the power to "unqualifiedly dictate corporate policy and the disposition of corporate assets."  Motion 18.  This is not a requirement under Seventh Circuit law.

[56] Compl. ¶ 19.

[57] *Id.* ¶¶ 24-30.

[58] 546 B.R. 549, 553–54 (Bankr. D. Del. 2016).

[59] *Id.* at 554.

preferential treatment for his private companies supported an inference that those companies had an insider relationship to the debtor.[60]

44.    In *In re Fortune Natural Resources Corp.*, the court had to determine whether a pre-petition creditor was an insider subject to section 502(b)(4).[61]  The creditor—Greenwich— was a law firm owned by Lacoff Associates, which was, in turn, owned by Brandon Locoff, the son of one of the debtor's directors.[62]  Greenwich's claim arose from a service agreement between the debtor and Lacoff Associates.  Pursuant to the agreement, Lacoff Associates provided the debtor with legal services from Greenwich.

45.    The court balked at the idea that an entity controlled by an insider could not itself be an insider:

> Indeed, when Brandon Lacoff is without question an insider of the debtor, it would be both folly and a triumph of form over substance to hold that the LLC over which [the insider] exerts complete control is not an insider. Certainly Congress' reasons for requiring heightened scrutiny for certain individuals apply with equal force to entities entirely controlled by such individuals. To hold otherwise would be to eviscerate this section of the code by inviting insiders to escape judicial scrutiny simply by incorporating themselves.[63]

The court went on to find that Greenwich was an insider of the debtor.[64]  Defendants are even closer in relationship to a statutory insider, Dremonas, than was Greenwich.

---

[60] *Id.* at 564 ("The allegations of a close relationship and excessive payments are sufficient to warrant scrutiny of the claims.").

[61] 350 B.R. 693 (Bankr. E.D. La. 2006)

[62] *Id.* at 698.

[63] *Id.* at 696.

[64] *Id.* at 698 ("The simple fact that Martin Lacoff, a director of Fortune, is Brandon's father is enough to arouse exceedingly strong suspicion that an insider deal was struck.").

17

46.     ***Second***¸ the transactional prong of the non-statutory insider test is satisfied because the Transfers were made at less than "arm's length."  An arm's length transaction is one "entered into in good faith in the ordinary course of business by unrelated parties with independent interests."[65]  *Black's Law Dictionary* (10th ed. 2014) defines an "arm's length" transaction as:

> 1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.

47.     The transfers at issue do not meet these definitions.  CGI and the Defendants were related—Director Dremonas was a director-insider of CGI and owned the Defendants.  There are allegations of bad faith and self-dealing—while CGI was insolvent, Director Dremonas authorized payments to the Defendants for his benefit, depriving non-insider creditors of recoveries.  These allegations are the hallmarks of insider self-dealing, not arm's lengths transactions.

48.     The Trustee's allegations are sufficient to find that the Defendants had a non-statutory insider relationship to CGI, and Counts 7, 9, 14, and 16 survive.  Further, the conduct alleged—that Director Dremonas used his insider position to divert over $450,000.00 from an insolvent debtor to his privately-owned company for no consideration—is exactly the type of circumstance that courts should scrutinize.  A finding of insider status ensures that this conduct comes under judicial scrutiny.

**F.     The Complaint Properly Seeks to Avoid Obligations.**

49.     Defendants argue that the Complaint has not alleged any obligations to avoid, thereby requiring the dismissal of Counts 3, 5, 10 and 12.[66]  This is wrong.

---

[65] *In re S. Beach Sec., Inc.*, 376 B.R. 881, 891 (Bankr. N.D. Ill. 2007), *aff'd*, 421 B.R. 456 (N.D. Ill. 2009), *aff'd*, 606 F.3d 366 (7th Cir. 2010); *In re Gluth Bros. Const., Inc.*, 424 B.R. 379, 393 (Bankr. N.D. Ill. 2009).

[66] Motion ¶¶ 40-49.

50.    In Counts 4, 6, 11, and 13 (the "<u>Transfer Counts</u>"), the Trustee seeks to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and 740 ILCS 160/5.[67]  In Counts 3, 5, 10 and 12 (the "<u>Obligation Counts</u>"), the Trustee seeks to avoid any obligations CGI had to make the Transfers pursuant to those statutes.

51.    It is common practice when seeking to recover a transfer as constructively fraudulent to first avoid any obligation that the debtor had to make the transfer.[68] This is so because the existence of a valid obligation to make the transfer (*i.e.*, an antecedent debt) defeats a constructively fraudulent transfer claim.  Because the Trustee expects Defendants to argue that CGI discharged antecedent debts in making the Transfers, the Trustee brought the Obligation Counts to buttress the Transfer Counts.[69]

52.    Defendants feign ignorance as to what obligations are at issue in the Obligation Counts, but the Complaint explains what obligations are at issue.  The obligation sought to be avoided in Counts 3 and 5 is the alleged obligation CGI incurred to pay the patronage dividend for fiscal 2016, which obligation is defined as the "2016 Patronage Dividend."[70]  The described obligation is referenced by this defined term in Counts 3 and 5.  (To be clear, the Trustee does not

---

[67] Compl. ¶¶ 35, 36.

[68] *See, e.g.*, *In re Cent. Illinois Energy Coop.*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015), *aff'd*, No. 15-1118, 2016 WL 299007 (C.D. Ill. Jan. 25, 2016) ("It is widely recognized by courts that where a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation."); *In re TSIC, Inc.*, 428 B.R. 103, 115 (Bankr. D. Del. 2010) (noting that "the Debtor in this case seeks to avoid both the transfer and the obligation and is within its rights to do so under Section 548.").

[69] Defendants suggest in the heading to the relevant argument section that the Trustee cannot avoid an obliation that has already been paid.  *See* Motion 19.  This is incorrect, as explained in *TSIC*, 428 B.R. at 115 ("Debtor can avoid the underlying obligation thereby effectively eliminating the debt. Because no debt existed, Debtor's transfer of [the payment to discharge the debt] was for less than reasonably equivalent value.").

[70] Compl. ¶¶ 24-26.

contend that any such obligation actually existed, but Counts 3 and 5 seek to avoid any such obligation, if it existed.)

53.     The obligation sought to be avoided in Counts 10 and 12 is any obligation CGI may have had to make "Allowance Dividend Payments" to Defendants.  The Complaint generally describes CGI's allowance dividend program,[71] but as noted in Counts 10 and 12, the Trustee contends that CGI had no obligation to make the Allowance Dividend Payments to Defendants.[72] However, the Complaint seeks to avoid any such obligation for the reasons described above.

54.     It is unclear what the Defendants' real complaint is with the Obligation Counts. The Complaint puts the Defendants on notice of the claims against them.  The Federal Rules require "notice" pleading, and Rule 8(a)(2), the operative rule here,[73] sets forth "liberal pleading standards."[74]  Rule 8(a)(2) only requires a plaintiff to give the defendant "fair notice" of the claim and the grounds upon which it rests.[75]  The Complaint, including the Obligation Counts, meet that standard.

**G.     The Complaint states a cause of action for unjust enrichment.**

55.     Finally, Defendants argue for dismissal of Count 18, which seeks to recover the Unpaid Receivable and the Transfers under an unjust enrichment theory.  Defendants argue that these counts must be dismissed because the Trustee alleged the existence of an express contract.[76] This argument fails because a plaintiff may plead unjust enrichment as an alternative to recovering

---

[71] *Id.* ¶¶ 29-30.

[72] The Trustee contends that CGI had no obligation to make the Patronage Dividend Transfers, either.

[73] Rule 8 and Rule 12 are applicable to this proceeding under Federal Rules of Bankruptcy Procedure 7008 and 7012.

[74] *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Antelis v. Freeman*, 799 F. Supp. 2d 854, 863 (N.D. Ill. 2011) ("A Rule 12(b)(6) motion must be considered in light of the liberal pleading standard of Rule 8(a)(2) . . . .").

[75] *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555).

[76] Motion ¶ 52.

under an express contract as long as allegations of the express contract are not included in the count for unjust enrichment.[77]

## REQUEST FOR LEAVE TO AMEND IN THE ALTERNATIVE

56.     The Trustee strongly believes that the Complaint sufficiently states claims for which relief may be granted.  However, if the Court finds the allegations to be lacking in some respect, the Trustee should be allowed to file an amended complaint with additional factual allegations in support of his claims.  Federal Rule of Civil Procedure 15 states that courts should freely grant leave to amend.[78]  And the Seventh Circuit has weighed in firmly supporting this rule, stating that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend his complaint before the entire action is dismissed."[79]  Here, any perceived deficiencies in the Complaint could certainly be resolved by additional factual allegations.  Accordingly, the Trustee requests leave to amend in the alternative.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny the Motion in its entirety or, alternatively, grant leave for the Trustee to file an amended complaint.

Dated: April 17, 2020                              Respectfully submitted,

                                                  */s/* Leo B. Oppenheimer
                                                  Eric D. Madden (admitted *pro hac vice*)
                                                  J. Benjamin King (admitted *pro hac vice*)
                                                  Leo B. Oppenheimer (admitted *pro hac vice*)

---

[77] *Chicago Title Ins. Co. v. Bass*, 2015 IL App (1st) 140948, ¶ 21, 31 N.E.3d 444, 451 ("Although a party may plead unjust enrichment in the alternative, it may not include allegations of an express contract in its counts for unjust enrichment.").

[78] FED. R. CIV. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (reversing denial of leave to amend and stating that the mandate of Rule 15(a)(2) "is to be heeded").

[79] *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293, 310 (7th Cir. 2018); *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015) ("When a district court denies a plaintiff such an opportunity, its decision will be reviewed rigorously on appeal.").

REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, TX 75201
(214) 420-8900 (T)
(214) 420-8909 (F)
emadden@rctlegal.com
bking@rctlegal.com
loppenheimer@rctlegal.com

*Special Litigation Counsel to*
*Howard B. Samuels, Chapter 7 Trustee for the*
*Estates of Central Grocers, Inc., Strack and*
*Van Til Super Market, Inc., and SVT, LLC*

-and-

Michael M. Eidelman
William W. Thorsness
Allison B. Hudson
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 (T)
(312) 609-5005 (F)
meidelman@vedderprice.com
wthorsness@vederprice.com
ahudson@vedderprice.com

*Counsel to Howard B. Samuels, Chapter 7*
*Trustee for the Estates of Central Grocers,*
*Inc., Strack and Van Til Super Market, Inc.,*
*and SVT, LLC*

## <u>CERTIFICATE OF SERVICE</u>

Leo B. Oppenheimer, the undersigned attorney, hereby certifies that on April 17, 2020, he caused the foregoing **Trustee's Opposition to Defendant's Motion to Dismiss Certain Counts in the Original Complaint** to be filed with the Court and served upon the parties to this adversary proceeding by the manner listed.

 /s/  Leo B. Oppenheimer  

**Electronic Mail Notice, via the Court's CM/ECF System**:

Adam B. Rome
Zachary P. Mulcrone
Greiman, Rome & Griesmeyer, LLC
Two North LaSalle, Suite 1601
Chicago, Illinois 60602
arome@grglelga.com
zmulcrone@grglegal.com

*Counsel to Defendants*